**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/14/2023

---

SAM SAMAAN,

                           Plaintiff,

        - against -

THE CITY OF NEW YORK, ROBERT
D'ALLESSIO, JAMES CORRAL, GEOFFREY
EISELE, MATTHEW MILLNER, and LEONID
MILLER,

                           Defendants.

---

**18 Civ. 9221 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Sam Samaan ("Samaan") brought this action against defendants the City of New York (the "City"), Robert D'Alessio[1] ("D'Alessio"), James Corral ("Corral"), Geoffrey Eisele ("Eisele"), Matthew Millner ("Millner"), and Leonid Miller ("Miller," together with D'Alessio, Corral, Eisele, and Millner, the "Individual Defendants" and collectively with the City, "Defendants"). He alleges multiple counts of discrimination on account of his age, race, and national origin, as well as retaliation for his complaints of discrimination based on Defendants' failure to promote Samaan to certain positions within the New York City Department of Buildings ("DOB").

---

[1] The Court recognizes the proper spelling of D'Alessio's name, as identified by Defendants. (See Dkt. No. 75, at 1 n.1.)

Samaan brought these claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000e *et seq.* ("Title VII"); the Age Discrimination in Employment Act, 29 U.S.C. Sections 621 *et seq.* (the "ADEA"); the Civil Rights Act of 1866, 42 U.S.C. Section 1981 ("Section 1981") and 42 U.S.C. Section 1983 ("Section 1983"); the New York State Human Rights Law, N.Y. Exec. Law Sections 290 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code Sections 8-101 *et seq.* ("NYCHRL").

Now before the Court is Defendants' motion for summary judgment on all of Samaan's claims pursuant to Federal Rule of Civil Procedure 56. (See "Motion," Dkt. No. 74.) For the reasons stated herein, the Court **GRANTS** Defendants' Motion.

## I.   BACKGROUND

### A.   RELEVANT PROCEDURAL HISTORY

Samaan commenced this case initially in the New York State Supreme Court for the County of New York on September 13, 2018. (See Dkt. No. 1-1.) The City removed the action to federal court based on Samaan's inclusion of federal causes of action. (See Dkt. No. 1.) On December 10, 2018, Samaan filed an Amended Complaint. (See Dkt. No. 11.) As will be important to a sub-issue discussed below, after submitting the Amended Complaint, Samaan did not file proof of service on ECF promptly after filing.

In January 2019, Samaan and the City engaged in letter briefing pursuant to the Court's Individual Rules of Practice, Section II.B, regarding the City's proposed motion to dismiss the action for failure to state a claim. (See Dkt. Nos. 12-13.) The Court held a conference to address the City's proposed motion. (See Dkt. Minute Entry dated Apr. 24, 2019.) During the conference, the Court indicated that it was not persuaded by the City's arguments in support of its proposed motion. However, the City raised concerns regarding the sufficiency of Samaan's service of process on the Individual Defendants. The Court did not rule on that issue during the conference, and Samaan filed proof of service as to all five of the Individual Defendants on the same day. (See Dkt. Nos. 16-20.)

On April 30, 2019, the City filed an answer on its own behalf. (See Dkt. No. 21.) Counsel for the City then submitted a letter dated April 29, 2019 (see Dkt. No. 22) seeking to file a motion to dismiss the Amended Complaint as against the Individual Defendants for insufficient service of process under Federal Rule of Civil Procedure 12(b)(5).

The Court then referred the parties to mediation, which was unsuccessful. (See Dkt. Nos. 23-33.) As part of a status report on the mediation efforts, Samaan opposed the grounds

for dismissal stated in the Individual Defendants' April 29, 2019 letter. (See Dkt. No. 29.)

The Court construed the Individual Defendants' April 29, 2019 letter as a Motion to Dismiss, which it denied. (See Dkt. No. 34.) The Court directed Eisele, Millner, and Miller to answer the Amended Complaint. However, because D'Alessio and Corral were no longer employed at the City department where Samaan attempted to serve process of the Amended Complaint on the Individual Defendants, the Court directed Samaan to try again to perfect service on D'Alessio and Corral, and to file proof of service within thirty days. (See id.) Within thirty days thereafter, the Summons was returned executed as to D'Alessio, but, after attempting service on June 30, 2020, it was returned unexecuted as to Corral. (See Dkt. Nos. 35-36.)

The City, Eisele, Millner, and Miller filed an Answer to the Amended Complaint on July 13, 2020 (see Dkt. No. 37); D'Alessio filed his on September 1, 2020 (see Dkt. No. 38).

After over a year of discovery, Defendants filed a pre-motion letter pursuant to the Court's Individual Rules of Practice, Section II.A., requesting a pre-motion conference on, and stating grounds in support of, its anticipated motion for summary judgment. (See Dkt. No. 64.) Samaan filed a response to Defendants' pre-motion letter. (See Dkt. No. 69.)

The Court then denied Defendants' request for a pre-motion conference and directed the parties to propose a briefing schedule, which the Court later adopted. (See Dkt. Nos. 70, 72-73.)

On March 15, 2022, Defendants filed their Motion for Summary Judgment ("Motion," Dkt. No. 74), their Memorandum of Law in Support of Summary Judgment ("Brief," Dkt. No. 75), the Declaration of Zachary Ellis in Support of the Motion ("Ellis Decl.," Dkt. No. 76) along with Defendants' Exhibits 1-8 ("Defs.' Exs. 1-8," Dkt. No. 76), and their Local Civil Rule 56.1 Statement of Material Facts ("Defs.' 56.1 Stmt.," Dkt. No. 77). Samaan opposed the Motion ("Oppo.," Dkt. No. 93) and filed a Counter Statement, responding to Defendants' Local Civil Rule 56.1 Statement, ("Counter Stmt.," Dkt. No. 92), and the Declaration of Anthony Ofodile ("Ofodile Decl.," Dkt. Nos. 90-91) along with Exhibits 1-16 ("Pl.'s Exs. 1-16," Dkt. Nos. 90-91). Defendants filed their Reply on December 7, 2022. ("Reply," Dkt. No. 100.) On March 1, 2023, Defendants filed a supplement to the Ellis Declaration to remediate an issue regarding documents inadvertently omitted from the summary judgment record. (See "Suppl. Ex.," Dkt. No. 101.)

B.   <u>FACTUAL BACKGROUND</u>[2]

Samaan was born in Egypt. He identifies as Arab, Egyptian, and Middle Eastern. As of September 2021, Samaan was 61 years old. In 1983, before moving to the United States, Samaan received a bachelor's degree in Civil Engineering from the University of Cairo. (<u>See</u> Defs.' Ex. 1, "Samaan Dep." 10:2-5.)

Prior to joining the DOB in 2008, Samaan worked in both the private and public sector as an engineer. Initially, Samaan worked for a company called Urban Engineering as "a consultant" for "around two years." (Samaan Dep. 19:20-23; Suppl. Ex. DEF056.[3]) Then, from approximately January 2000 to June 2001, Samaan was employed by the New York City Department of Environmental Protection ("DEP") as an Associate Engineering Technician. Samaan's position with the DEP was part of the City's Civil Service, and Samaan's Civil Service

---

[2] Except as otherwise noted, the following background derives from the facts as set forth by Defendants in their Rule 56.1 statement of material facts and Samaan's Counter Statement. (<u>See</u> Defs.' 56.1 Stmt.; Counter Stmt.) The Court has also considered the full record submitted by the parties, including factual averments and admissions made previously in the record. No further citations to the record will be made herein except as specifically quoted. The Court construes any disputed facts discussed in this section and the justifiable inferences arising therefrom in the light most favorable to the nonmovant, Samaan, as required under the standard set forth in Section II below.

[3] For ease of reference, the Court cites to the Bates numbered pages in the exhibits, removing any leading zeroes. Where no Bates numbers were available, the Court cites to the ECF page number in the exhibits. For briefs, the Court cites to the original pagination.

title in this position was Civil Engineer Level 1.[4] Samaan then left the DEP for another Civil Service job with the City in the Department of Design and Construction ("DDC"), where his Civil Service title was Construction Project Manager Level 1. Samaan held this position from June 2001 to June 2004. After June 2004, there is a gap in Samaan's resume until he joined the private sector firm, Tectonic Engineering, in August 2008, where he was employed as a Senior Engineer.

Sometime in 2007, the DOB created a new unit called the Excavation Unit. D'Alessio was chosen to be the Project Manager of the new unit. Around six to eight months after the Excavation Unit was established, the New York City Civil Service Commission established a new provisional Civil Service title, Administrative Engineer. In terms of Civil Service title classification hierarchy, the title of

---

[4] Although not dispositive of any issue, the New York Civil Service law provides a backdrop to many of the issues in this case. The New York State Constitution mandates that "civil service appointments and promotions be made according to merit," and "evidences strong public policy that merit and fitness should govern the selection of candidates," rather than relying on the previous "spoils" system. 19 N.Y. Jur. 2d Civil Servants § 287; see also City of Long Beach v. Civil Serv. Emps. Ass'n, Inc., 867 N.E.2d 389, 392 (N.Y. 2007). Many Civil Service appointments require first passing an examination. This so-called "competitive class" of Civil Service appointments includes "all positions, of whatever functions, designations, or compensation, in each and every branch of the classified service," "for which it is practicable to determine the merit and fitness of applicants by competitive examination." 19 N.Y. Jur. 2d Civil Servants § 328. Like appointments, "promotions [are to] be made according to merit and fitness as determined by examination" and "must be made from eligible lists." Id. §§ 334, 336. The strength of applicants' score on the examination in combination with their seniority determines their priority on the eligible list.

Administrative Engineer is a promotion over the title of Civil Engineer, the Civil Service title that Samaan held while employed by DEP. The Administrative Engineer title also has a higher potential maximum salary band than that for Civil Engineer, although the height of the salary cap is based, in part, upon the classification level, which runs from M-1 to M-4. Between 2007, when the Excavation Unit was created, and 2017, anyone holding the Administrative Engineer title did so only provisionally, as the City had yet to establish a Civil Service list for the position.[5]

In August 2008, Samaan applied and was interviewed for a position as an Administrative Engineer, M-1, in the DOB's new Excavation Unit. D'Alessio interviewed Samaan for the position. Although Samaan had interviewed for the provisional title of Administrative Engineer, M-1, Samaan eventually

---

[5] A Civil Service list is established after a competitive examination is administered. Once an exam has been administered, "appointment or promotion from an eligible list to a position in the competitive class shall be made by the selection of one of the three persons certified by the appropriate civil service commission as standing highest on such eligible list who are willing to accept such appointment or promotion." N.Y. Civ. Serv. L. § 61(1). If no competitive examination has been administered and no eligible list available to fill a position exists, a candidate may be appointed "provisionally" to fill the vacancy after a "noncompetitive examination" and until "a selection and appointment can be made after competitive examination." Id. § 351. A noncompetitive examination includes "review and evaluation of the training, experience and other qualifications of the nominee, without written, oral or other performance tests." N.Y. Civ. Serv. L. § 65(1). Provisional appointments are not permanent and may only be continued successively where there is no eligible list. Id. § 65(3)-(4). "A provisional appointment to any position shall be terminated within two months following the establishment of an appropriate eligible list for filling vacancies in such position." Id. § 65(2).

accepted the position under the Civil Service title, Civil Engineer, Level 3, with a salary of $90,000 per year. (See Defs.' Ex. 8 DEF189.) The $90,000 starting salary was the same salary as that listed for the Administrative Engineer, M-1, position for which he originally applied. Samaan's employment with the Excavation Unit began on December 8, 2008. (Id.)

On May 13, 2009, after Samaan had started working with the Excavation Unit, he received an email from someone named Trisha Deutch. That email explained that Samaan's name had "been certified by DCAS on the open competitive Civil Engineer civil service list," and that his "appointment will be as a Civil Engineer L-3." (Id. DEF344.) Samaan replied later that day "accept[ing] the appointment as a Civil Engineer L-3." (Id.)

Then, on July 14, 2009, Samaan received a letter from Salvador Valles, the Director of Human Resources at DOB, confirming that Samaan's "request to pick up and transfer [his] probable permanent title of Civil Engineer Level 3 from the Department of Environmental Protection to the Department of Buildings at a salary of $93,600 ha[d] been approved effective April 15, 2009." (Id. at DEF185.)

During Samaan's tenure, beginning in 2008 and until 2018, then-Commissioner of the DOB, Robert LiMandri, pushed

9

the DOB to hire engineers with private sector experience. As D'Alessio recalled, the directive was to "bring in fresh blood," in essence, engineers from "outside" the City -- "people from the industry that worked in the industry." (See Defs.' Ex. 2, "D'Alessio Dep." 133:19-136:3.) The purpose was to create a "more professional staff." (Id. 135:7-8.)

Beginning in 2010 or 2011, Samaan "repeatedly requested that his Civil Service title be changed from Civil Engineer to Administrative Engineer and that he be given a concomitant salary increase." (Defs.' 56.1 Stmt. ¶ 22.)

A few years later in February 2013, Samaan, then-aged approximately 52, began applying and interviewing for promotion to positions with the Civil Service title of Administrative Engineer within the DOB.

On or around February 6, 2013, Samaan applied for one of three positions with the title Administrative Engineer, M-1 (Job ID: 109973), which had a posted salary range of $49,492 to $136,198. (See Suppl. Ex. DEF196-197.) The job was reposted on or around September 17, 2013, and Samaan reapplied. (Id. DEF200-201.) No one was hired for this position.

Also, on or around September 17, 2013, Samaan applied for another posted position for Administrative Engineer, M-1 (Job ID: 130320), which had a posted salary range of $49,492 to $136,198. (Id. DEF202.) The business title for this

position was "Assistant Chief Engineer" and had the Career Level of "Manager." (Id.) Samaan interviewed for this position on December 2, 2013 and was selected as the Third Choice candidate. (Id. DEF367.) Ghouse Ismail, who is of Pakistani origin and who was 73 years old at the time, was the recommended candidate after the interviews, and was hired for the position.[6]

On or around January 9, 2014, Samaan applied for a position posted for Administrative Engineer, M-2 (Job ID: 120206), which had a posted salary range of $54,740 to $146,276. (Id. DEF205-206.) The business title for this position was "Executive Engineer for Safety Operations" and had the Career Level of Manager. (Id.) Samaan was interviewed on March 24, 2014. (Id. DEF368.) The interview log reflects that Samaan was noted as having "[i]nadequate managerial/supervisory skills" and was not recommended for hire. (Id.) Samaan was one of nine interviewees for the position. Corral, who is white and was then-aged 30, was hired for the position. (See id. DEF376.)

Samaan next applied for a position on September 12, 2014. The position posted was for Administrative Engineer, M-1 (Job ID: 167286), which had a posted salary range of $49,492 to

---

[6] D'Alessio believed that Ismail was "Arab." (See D'Alessio Dep. 139:14-23.)

$90,000. (Id. DEF210.) Samaan was initially interviewed by Khaled Eid ("Eid"), who is of Egyptian and Arab origin, and who had been transferred to the Excavation Unit from the Forensics Unit at the DOB. Around the time that Eid was being transferred into the Excavation Unit, Samaan recalled that D'Alessio approached him and stated, "Khaled is Egyptian like you. What do you know about Khaled?" (Samaan Dep. 55:8-11.) Samaan understood this question to mean that D'Alessio "didn't like [the] idea" of Eid being transferred into the department. (Id. 56:3-4.)

Eid held a director's title when he was transferred. (See D'Alessio Dep. 72:23.) After interviewing with Eid, Samaan was the number one choice recommended for hire. However, Eid had not been authorized to conduct the interviews. Others in the DOB, including D'Alessio and the deputy commissioner of the DOB, were unimpressed by Eid's performance and Eid was due to be removed from his position. (See id. 120:19-21, 121:23-25, 122:7-8.) The interviews were rendered a nullity. None of the eight candidates interviewed for the position was hired.

On November 12, 2014, Samaan emailed Michael Alacha ("Alacha"), the Assistant Commissioner of Engineering and Safety Operations, copying D'Alessio and Eid, requesting a

"meeting to discuss my title."[7] (Defs.' Ex. 8 DEF215.) In the email, Samaan raised that he had joined the DOB six years ago as a "Civil Engineer, Level 3" and that "All my colleagues were hired before me as Administrative engineers." (Id.) He discussed the jobs that he applied for on February 6, 2013 (Job ID: 109973) and September 17, 2013 (Job ID: 130320), for which Ismail was hired over him. (Id.) He also raised that he applied for a recent posting for Administrative Engineer, for which he had interviewed with Eid, and which was eventually cancelled. Samaan explained that he was "doing the tasks for administrative engineer for the last six years like my other colleagues" and that he "hope[d] to be considered this time for the Administrative Engineer title." (Id.) Alacha responded that the "department value[d] [Samaan's] hard work" and that he was "trying to work on salary adjustment for engineers in the unit." (Id.)

On March 6, 2015, the same job for which Samaan interviewed with Eid (now Job ID: 167286) was reposted and Samaan reapplied. (See Defs.' Ex. 8 DEF232-233.) As in September 2014, the posted salary range was $49,492 to $90,000. At that time, Samaan's salary was $97,883. (See id.

---

[7] At his deposition, Samaan described this email as an email about "discrimination, about [the] discrimination for [his] age, about [the] discrimination for [his] race, and for [not] getting the title because of [his] race and [his] age." (Samaan Dep. 56:15-17.)

DEF340.) D'Alessio directed Corral to conduct the interviews
for the reposted position. The interview notes reflect that
Samaan "declined the position after he was told the maximum
salary was $90k." (Id. DEF458.) Pawel Szostak, a white man
then-aged 45, was recommended and eventually hired into the
position.

On April 21, 2015, Samaan applied for another position
(Job ID: 190446), with the Civil Service title of
Administrative Engineer, M-2, which had a posted salary range
of $57,244 to $130,000. (Id. DEF241.) The business title for
this position was "Director of Engineering," and had a career
level of "Manager." (Id.) The "Preferred Skills" for the
position included "5 years of managing a staff of 5 or more"
along with "8 years of full-time paid experience in
civil . . . engineering; at least 4 years of which have been
at the managerial level." (Id. DEF242-243.) Samaan
interviewed for the position on May 7, 2015. (Id. DEF248.)
The interview sheet reflects that Samaan was determined to
have "inadequate managerial/supervisory skills." (Id.
DEF00369.) Eisele was recommended for hiring, while Ismail
was recommended as the back-up choice, and a candidate named
Mohammed Seraz was noted as the third choice. (Id.)

Eisele was hired for the Director of Engineering role
sometime in September 2015. Eisele identifies as Caucasian

and Hispanic and was 34 at the time he was hired. (See Pl.'s Ex. 2, "Eisele Dep.," 13:18-19.) Eisele had been working full-time as an engineer in the private sector since 2003, around 12 years. (Id. 14:10-12.) During that time, he received several promotions. Eventually, Eisele was promoted to "senior engineer," a position he held for "five years," where he managed "junior engineers under [his] watch for certain projects." (Id. 17:16-19). In the year before joining the DOB, Eisele was promoted to "associate" of his firm where he was "managing and overseeing a studio of approximately 10 engineers." (Id. 23:2-18.)

In late-2015, early-2016, Samaan discussed the Administrative Engineer title with D'Alessio. (Samaan Dep. 50:14-16.) After the discussion, Samaan was given some additional tasks and responsibilities. The "[f]irst one [was] to train the new Engineers, Assistant Engineers, interns, Plan Examiner[s] or Assistant Plan Examiner[s]," which Samaan indicated he was already doing at that time and which was normal in the department. (Samaan Dep. 50:18-21; D'Alessio Dep. 97:3-9 (discussing that the training and mentoring of new employees was a "common experience within the department").) Samaan created training materials as part of this task. (Samaan Dep. 51:2-3.) The "[s]econd task [was to handle the proactive audit." (Id. 51:10-11.) And the "third

task [was] to follow up with the critical jobs . . . [meaning] jobs for critical buildings that got damaged after excavation or after collapse." (Id. 51:13-20.) Because Samaan was taking on these additional responsibilities, D'Alessio and Eisele worked with Human Resources to approve an eight percent raise for Samaan, which was effective January 6, 2013. Samaan's salary jumped from $100,367 to 108,396. (See Defs.' Ex. 8 DEF340.)

Next, on March 10, 2016, Samaan applied for a position with the Civil Service title Administrative Engineer, M-2 (Job ID: 235016). The position had a posted salary range of $58,675 to $150,000. (See Defs.' Ex. 8 DEF251.) The business title of the position was "Executive Engineer," and the career level was "Manager." (Id.) The position of "Executive Engineer" is a promotion from the position of "Director of Engineering." (See Samaan Dep. 83:2-5.) On April 13, 2016, the Deputy Commissioner of the DOB, Timothy Hogan, the Major Projects Director, Bernard "Bobby" Ross, and D'Alessio, then the Senior Executive Director, interviewed Samaan. (Defs.' Ex. 8 DEF370.) Samaan was one of six candidates to be interviewed. The interview log reflects that the interviewers determined that Samaan did not "possess necessary preferred skills" for the position, and Samaan was not recommended for

hire. (Id.) Instead, Eisele was recommended and was promoted to the position. The back-up choice was Mohammed Seraz.

On April 6, 2016, Samaan applied for a job posted with the Civil Service title Administrative Engineer, M-1 (Job ID: 237265). This was a non-managerial position, with the posted salary range of $48,535 to $132,061. (Id. DEF253.) The position was eventually canceled. On May 11, 2016, Samaan emailed Trisha Munroe at the DOB asking if the position is "still valid or [if] it was canceled." (Id. DEF259.) Munroe responded that the "position was cancelled [sic] and it was reposted as a Civil Engineer L-2." (Id.) Samaan did not reapply for the position.

Around this time, the New York City Department of Citywide Administrative Services ("DECAS") was preparing to, for the first time, administer the Civil Service examination for placement on the eligibility list for a promotion to Administrative Engineer, M-1. In late-2016, Samaan took that Civil Service exam.

On June 6, 2016, Samaan applied for another position with the posted Civil Service title Administrative Engineer, M-2 (Job ID: 242484). (See Suppl. Ex. DEF263-64.) The position had the business or office title of Director of Engineering, much like the position that Samaan had applied for around a year earlier, and had the posted salary range of $58,675 to

$130,000. (Id.) The posting included that the candidate have the preferred experience of "4 years of managing a staff of 5 or more." (Id.) On June 28, 2016, Eisele and D'Alessio interviewed Samaan. Eisele and D'Alessio gave Samaan average to above-average scores on certain interview criteria, including for "Management Skills," for which they both ranked Samaan as average. (Defs.' Ex. 8 DEF372-373.) Four other candidates were interviewed. Samaan was recommended as the back-up selection, and Ismail was recommended as the third choice. Millner was recommended and eventually hired for the position. (Id. DEF371.)

Millner's hiring as the Director of Engineering was an internal promotion. Prior to joining the Excavation Unit, Millner was an "administrative engineer with the forensic engineering unit" since around "July 2015." (Pl.'s Ex. 6, "Millner Dep.," 9:12-17.) Before that, Millner had worked in the private sector since 2006. (Id. 10:25-11:22.) After eight years in the private sector, Millner was promoted to "Senior Project Engineer," where his role required him to "manag[e] the most complex project[s] that the office would have. And, managing younger staff," among other responsibilities. (Id. 23:11-14.) In that role, Millner managed a "team of five or six" people with titles ranging "from senior engineer to project engineer to engineer, to interns." (Id. 23:22-24:8.)

On August 10, 2016, Samaan applied for a job with the posted Civil Service title of Administrative Engineer, in the Construction Safety Unit (Job ID: 249788), a non-managerial position. The posted salary range for the position was $46,535 to $105,000. (See Suppl. Ex. DEF265-268.) The interview log indicates that Samaan was set to be interviewed by Eisele and Millner, but that Samaan "Declined [the] Interview." (Defs.' Ex. 8 DEF374.) Eisele emailed Samaan on August 18, 2016 with the subject line "Admin Engineer Posting 249788" asking Samaan to "discuss this position early next week." (Id. DEF460.) Five minutes after Eisele sent his email, Samaan responded to Eisele "OK" and thanked him. (Id.) On October 31, 2016, Eisele emailed himself in the same email chain: "[f]or [the] record, Sam Samaan declined to interview after discussion. It appears the maximum posted salary for this job posting was too low for the applicant and he declined to interview." (Id.)

Three others were interviewed for the Administrative Engineer position, Austin Allcot ("Allcot"), Imran Akond ("Akond"), and Md Shariful Islam. Allcot was interviewed by Eisele and two others, while Akon was interviewed by Eisele and Millner. Both Allcot, who is white and was 33 at the time, and Akond, who Samaan characterized as having "darker" skin

19

and from Bangladesh and who was 32 at the time, were recommended for hire. (Id. DEF374, 376.)

In December 2016, Samaan applied for a job with the Civil Service and Office title, Administrative Engineer/Architect in the "BEST Squad," (Job IDs: 269639-269305). (See id. DEF375.) The job posting showed that the salary range was between $49,990 and $103,000 per year. (See Suppl. Ex. DEF317.) D'Alessio was the hiring manager for this position, and the BEST Squad was overseen by Corral as Executive Engineer, and Miller as Assistant Commissioner. (See Samaan Dep. 87:4-6.) Samaan was interviewed on December 19, 2016 by John Chiusano ("Chiusano"), the Chief Plan Examiner for the BEST Squad, and the Assistant Chief, Erik Jostock ("Jostock"). The interview log reflects that Samaan was ranked as "Qualified" and was the third-choice candidate. Chiusano and Jostock both gave Samaan high objective scores on the various evaluation criteria. (See Pl.'s Ex. 16.) Nevertheless, Robert Masone was recommended for hire.

After Samaan's interview for the position with the BEST Squad, he met with Miller around Christmas, 2016. During this meeting, Samaan expressed to Miller that he wanted the Civil Service title of Administrative Engineer despite the City not having had finalized the Civil Service list. Samaan told Miller that he had been with the department for "nine years"

20

and complained that the Excavation Unit was "avoiding to promote [him] to Administrative Engineer, avoiding to give [him] any salary adjustment for the added tasks." (Samaan Dep. 87:14-23). Miller recalled that "during the time the meeting took place the DECAS performed a test for the administrative engineer and the list of people who passed the test was still pending with DECAS." (Pl.'s Ex. 4, "Miller Dep." 19:12-20.) Miller expressed to Samaan that he could not just give him the title of Administrative Engineer because "unfortunately, those are the civil service rules and I cannot do anything even if I want to. So you just have to wait until the civil service list is certified and if he is on that list he will automatic[ally] get that title." (Id. 22:22-23:3.)

In his discussion with Miller, Samaan testified that he told Miller he had been offered the position with the BEST Squad by Chiusano but that Miller understood that Samaan had already "declined the position" with the BEST Squad. (Samaan Dep. 87:9-88:19.)

Then, in January 2017, Samaan applied for the position of Deputy Director of the Cranes and Derricks Unit, which had the Civil Service title of Administrative Engineer, M-1 (Job ID: 283669). Samaan was interviewed by two people: Ashraf Omran, who is of Egyptian origin but younger than Samaan, and Dan Esknasy, who is "older than [Samaan]." (Samaan Dep.

21

93:14.) At that time, no person was selected to fill the position. Miller recalled that "the position was cancelled by human resources for unknown reasons." (Miller Dep. 35:9-12.)

In or around May or June 2017, Samaan "submitted a complaint with the [DOB's] E[qual] E[mployment] O[pportunity] [office] [("EEO")] for [] discrimination." (Samaan Dep. 95:16-24.) This was Samaan's only complaint filed with the DOB's EEO office and there is no evidence of this charge, other than Samaan's testimony, in the record. (Id. 95:21-24.)

On June 8, 2017, Samaan received the results from the DECAS Civil Service Examination for Administrative Engineer. Samaan passed, and his Adjusted Final Average score was 100 percent. (See Pl.'s Ex. 15 at 2.) Samaan was listed as number 320 on the eligible list. (Id. at 3.) Several others who had previously been promoted over Samaan in the Excavation Unit also had taken the test at the time. Ismail scored 100 percent and was listed higher than Samaan as number 282. (Id.) Miller was listed 388 although also scoring 100 percent, as did Eisele, listed 575. (Id. at 4-5.) Austin Allcot scored 94 percent on the test and was listed 671. (Id. at 6.) Millner scored 88 percent and was listed 703, as did Masone, listed 708. (Id. at 6-7.) Others scored lower, such as Akond and Pawel Szostak, who both scored 76 percent and were listed at 745 and 759, respectively. (Id. at 7-8.)

In late-June or early-July 2017, Samaan resigned from his position with the DOB's Excavation Unit to accept "a position in the grant funded Build it Back Program with the Department of Environmental Protection (DEP)." (See Defs.' Ex. 7 DEF145.) During his time with the DEP, Samaan's civil service title of Civil Engineer, Level 3 was placed on "leave of absence for the duration of the grant funded position." (Id.) Samaan's separation form explained that if Samaan chose "to return to DOB" he would "return to [his] permanent civil service title of Civil Engineer, Level 3 at the salary [he] w[as] receiving when [his] permanent civil service title was placed on leave." (Id.) Samaan's title for the grant-funded position was Construction Project Manager and his provisional Civil Service title was Administrative Engineer, M-1. Samaan started this position on July 7, 2017, and Samaan continued to hold this position through the duration of this action.

On June 15, 2017, the City posted a position to fill the vacancy Samaan's resignation created (Job ID: 291755). (See Defs.' Ex. 8 DEF273-277.) The posted salary range was between $49,990 and $103,000. (Id. DEF273) The position's title was Administrative Engineer, and the Civil Service title was Administrative Engineer (Non-Managerial). (Id.) Despite the fact that Samaan would soon leave for the grant-funded position, on June 28, 2017, Samaan applied for the position.

(<u>Id.</u> DEF274-76.) Samaan was interviewed for the position by Eisele, Millner, Miller, and Bernard Ross on July 17, 2017, after he had started the granted-funded position with DEP. (<u>Id.</u> DEP000277.) Samaan was one of four applicants to be interviewed. Austin Allcot was selected for the position.

On December 20, 2017, Samaan filed a charge with the United States Equal Employment Opportunity Commission, alleging that he had been discriminated against by the DOB.

Over the course of the approximately eight years that Samaan repeatedly requested changes to his Civil Service title and a concomitant salary adjustment, Samaan received ratifications bonuses and all the general wage increases he was due under his Collective Bargaining Agreement. At all points, although paid less than the maximum salary for the Administrative Engineer title, Samaan was paid more than the minimum. At the time Samaan left the DOB on July 9, 2017, Samaan's salary was $111,648 -- $21,000 more than when he had joined the department nine years earlier. (<u>Id.</u> DEF340.)

## II.  <u>LEGAL STANDARD</u>

In connection with a motion under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." <u>Samuels v. Mockry</u>, 77 F.3d 34, 35 (2d Cir.

24

1996) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-50 (1986)). The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the burden of proving that no genuine issue of material fact exists or that, because of the paucity of evidence presented by the nonmovant, no rational jury could find in favor of the nonmoving party. <u>See</u> <u>Gallo v. Prudential Residential Servs., L.P.</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson</u>, 477 U.S. at 247-48.

In determining whether the moving party is entitled to judgment as a matter of law, the court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." <u>Major League Baseball Props., Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 309 (2d Cir. 2008). Though a party opposing summary judgment may not "rely on mere conclusory allegations nor

speculation," <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party, <u>see</u> <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

### III. <u>DISCUSSION</u>

Before addressing the substance of the dispute, the Court begins with two threshold issues: first, the status of James Corral as a defendant in this matter; and second, the scope of the claims as narrowed by various limitations periods.

### A.   <u>JAMES CORRAL</u>

Defendants raise that Corral "has not been served in this matter" and request that "the Court *sua sponte* dismiss Mr. Samaan's claims against Mr. Corral under Rule 4(m) of the Federal Rules of Civil Procedure for failure to serve the defendant[.]" (<u>See</u> Brief at 1 n.2.) Samaan fails to address this point in his opposing brief.

Rule 4(m) of the Federal Rules of Civil Procedure ("Rule 4(m)") requires a plaintiff to effect proper service on the defendant within 90 days of the filing of the complaint. Fed. R. Civ. P. 4(m). Where a plaintiff fails to do so, the Court "must dismiss the action without prejudice against [the] defendant or order that service be made within a specified

time." Id. The Court must extend the time to effect service only if the plaintiff has demonstrated good cause for its failure. Id.; see also Blessinger v. United States, 174 F.R.D. 29, 31 (E.D.N.Y. 1997) (noting if a plaintiff demonstrates good cause, "the extension is mandatory").

As discussed above, the Amended Complaint in this action was filed over four years ago, on December 10, 2018. (See Dkt. No. 11.) Then, around two-and-a-half years ago, Defendants moved to have the case dismissed under Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process as to D'Alessio and Corral. The Court directed Samaan to properly serve the two individuals within thirty days. But as to Corral, the docket reflects that service of the summons and the Amended Complaint "was attempted" on June 30, 2020, and that the summons was returned unexecuted. (See Dkt. No. 36.) No further attempts to serve Corral have been made and Samaan offers no explanation, let alone good cause, for his failure to effect service on Corral.

Accordingly, because Corral was never properly served, the Court shall dismiss the action as to Corral. While Rule 4(m) normally directs courts to order dismissal "without prejudice," "a district court may dismiss a case *with* prejudice where 'the problem with the plaintiff's causes of action is substantive,'" Black v. Vitello, 841 F. App'x 334,

336 (2d Cir. 2021) (citing Cuoco v. Moritsugu, 222 F.3d 99,
112 (2d Cir. 2000)) (original alterations omitted, emphasis
added), or where the statute of limitations on the claims has
expired, see Robinson v. City of Buffalo, No. 16 Civ. 432,
2017 WL 2021528, at *8 (W.D.N.Y. May 12, 2017). Therefore,
because the Court grants summary judgment for Defendants in
its entirety and because the statute of limitations on all of
Samaan's claims have long since expired were he to serve
Corral today, the Court dismisses Corral with prejudice.

   B.   STATUTE OF LIMITATIONS

   Defendants also argue that several of the alleged
adverse employment actions are untimely and must be dismissed
as time barred under the various statutes' applicable
limitations periods. Samaan, again, does not address these
arguments in his Opposition, and so the Court deems them
abandoned and grants Defendants their requested relief. See
Douglas v. Victor Capital Grp., 21 F. Supp. 2d 379, 393
(S.D.N.Y. 1998) (affirming report and recommendation to grant
summary judgment for defendant after deeming claims
"abandoned" upon plaintiff's failure to oppose arguments).

   The limitations period for claims brought under Section
1981, Section 1983, the NYSHRL, and the NYCHRL is three years.
See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 238
(2d Cir. 2007); Milan v. Wertheimer, 808 F.3d 961, 963 (2d

Cir. 2015); McCalla v. City of New York, No. 15 Civ. 8002, 2017 WL 3601182, at *32 (S.D.N.Y. Aug. 14, 2017), report and recommendation adopted by No. 15 Civ. 8002, 2017 WL 4277182 (S.D.N.Y. Sept. 22, 2017) (explaining that for Section 1981 claims "based on a failure-to-promote theory . . . . If the promotion would have created a new contract, the three-year statute of limitations applies") (internal citations and original alterations omitted). Samaan filed his complaint in the New York State Supreme Court, New York County on September 13, 2018. Thus, any claim accruing prior to September 13, 2015 is time-barred and dismissed as a matter of law.[8]

Although Samaan abandoned any argument regarding actionable claims under Title VII and the ADEA, the Court must address one factual issue with respect to which claims are actionable. For claims brought under Title VII and the ADEA, New York, as a dual-filing state, requires plaintiffs to "file a charge under Title VII within 300 days of the occurrence of a discriminatory act." Yang Zhao v. Keuka College, 264 F. Supp. 3d 482, 492 (W.D.N.Y. 2017) (first citing 42 U.S.C. § 2000e-5(e)(1), then citing Ford v. Bernard

---

[8] The only employment decisions that are actionable under the three-year period are Samaan's (1) March 10, 2016 application (Job ID: 235016); (2) April 6, 2016 application (Job ID: 237265); (3) June 6, 2016 application (Job ID: 242484); (4) August 10, 2016 application (Job ID: 249788); (5) December 2016 "BEST Squad" Application (Job ID: 269639-269305); (6) January 2017 "Cranes and Derricks" application (Job ID: 283669); and (7) June 28, 2017 application (Job ID: 291755).

Fineson Dev. Ctr., 81 F.3d 304, 307 (2d Cir. 1996)). It is undisputed that Samaan filed his notice of charges with the EEOC on December 20, 2017. (See Defs.' Ex. 8 DEF176.) Only those adverse employment decisions occurring after February 23, 2017, i.e., 300 days before Samaan filed his charge, are timely.

Two employment decisions arguably fall within the range. First, the Court has no doubt that Samaan's June 28, 2017 application (Job ID: 291755) falls within that timeframe and is actionable. The second potential instance, Samaan's application to be Deputy Director of the Cranes and Derricks Unit, presents a more difficult question.

The record and briefing are less than clear as to when exactly Samaan applied for the Cranes and Derricks position. Defendants' Rule 56.1 Statement says that "[i]n 2018, Mr. Miller encouraged Samaan to apply for the position of Deputy Director of the Cranes and Derricks Unit." (Defs.' 56.1 Stmt. ¶ 58.) Samaan agrees with this proposition. (See Counter Stmt. ¶ 58.) But both parties cite the same portion of Samaan's deposition testimony as the evidence supporting this statement. There, Samaan unequivocally stated that "[Miller] came to [him] some time in January 2017 . . . and he told [him], 'Sam do you want to get -- join the -- Do you like to join the cranes and derricks.' . . . . *That was in January*

*2017*." (See Samaan Dep. 90:21-22; 91:10 (emphasis added)) In questioning Miller, Samaan's counsel also placed this event in 2017, asking Miller if he recalled "going to Sam Samaan [in] 2017 and offering him the position of deputy director of cranes and derricks unit?" (Miller Dep. 34:23-25.) Although there is no other evidence in the record documenting when Samaan applied for the position, it strains credulity that the parties would agree that events taking place *after* Samaan filed his charge with EEOC would be actionable under Title VII and the ADEA, as the administrative requirement to bring suit in federal court would not have yet been satisfied. See Hill v. Citibank Corp., 312 F. Supp. 2d 464, 472 (2004) ("[B]efore bringing a claim in federal court, a New York plaintiff *must file* a charge with the EEOC.") (emphasis added). The Court is persuaded that, based on its own review of the evidence, the events must have taken place in 2017.

But even with that finding, whether the claim is timely under Title VII and ADEA is complicated by the dearth of evidence regarding when the claim accrued. Under Second Circuit precedent, a failure-to-promote claim accrues for statute of limitations purposes from the date that the employee "knows or has reason to know of the injury which is the basis of his action." Corwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994). There is no evidence in the record

31

indicating when Samaan had reason to know he would not be promoted to the position. When asked if and when he learned about the results of the Cranes and Derricks position, Samaan responded in general terms: "No. Usually you don't. They don't send any E-mail or any answer for who filled the position or if they held the position. They leave us in the dark. There is no answer. All the interviews [are] like that. We don't know." (Samaan Dep. 92:9-13.)

Samaan claims only that "later on the position was filled b[y] a much younger white woman." (Counter Stmt. ¶ 61.) Samaan provides no corroborating evidence of this actually occurring, let alone when it occurred or who filled the position. Without supporting evidence, the timeline of Samaan's application for and denial of a promotion to the Cranes and Derricks position is rife with ambiguity. It does not, however, present a triable issue of fact. Reviewing the facts in the record in the light most favorable to Samaan, the Court cannot dismiss the Title VII and ADEA claims with respect to this discrete act on statute of limitations grounds as, with Samaan applying in January 2017, the claim may have accrued after the February 23, 2017 cut-off date, making it actionable. Accordingly, only the adverse employment decisions related to Samaan's January 2017 "Cranes and Derricks" application, and Samaan's June 28, 2017 application

are actionable under Title VII and the ADEA. All other claims under Title VII and the ADEA are untimely and dismissed as a matter of law.

C. THE SURVIVING CLAIMS UNDER SECTIONS 1981, 1983, THE NYSHRL AND NYCHRL, TITLE VII, AND THE ADEA[9]

Each of Samaan's claims under Sections 1981, 1983, the NYSHRL, NYCHRL, Title VII, and the ADEA use the same analytical burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). That is, at the outset, Samaan has the burden of "proving by a preponderance of the evidence a *prima facie* case of discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). Once a *prima facie* case has been established, the burden (this time, a burden of production) shifts to Defendants to rebut the presumption of discrimination or retaliation by articulating a legitimate, non-discriminatory reason for their employment decision. See id., 530 U.S. at 142-143. If Defendants articulate a legitimate, non-discriminatory

---

[9] Defendants invite the Court to dismiss the Section 1981 claims against the Individual Defendants because Section 1981 does not provide a separate private right of action against state actors. (Brief at 20.) The Second Circuit has joined other Circuits in concluding that "[Section] 1981 does not provide a separate private right of action against state actors" "[b]ecause [Section] 1983 already provides a remedy against state actors, [and] there is no reason to infer from the right-conferring language of [Section] 1981(c) that it creates an additional, and duplicative, remedy." Duplan v. City of New York, 888 F.3d 612, 620-21 (2d Cir. 2018). This is true enough. However, because the Section 1981 and Section 1983 claims are assessed under the same standard, and because the Court will grant summary judgment on all claims, the Court does not resolve this issue.

reason, the McDonnell Douglas burden-shifting framework
disappears, and Samaan must show that "the adverse employment
decision more likely than not was motivated in whole or part
by discriminatory reasons." McCalla, 2017 WL 3601182, at *28
(citing Reeves, 530 U.S. at 142-43). "Moreover, although the
presumption of discrimination 'drops out of the picture' once
the defendant meets its burden of production, . . . the trier
of fact may still consider the evidence establishing the
plaintiff's *prima facie* case 'and inferences properly drawn
therefrom . . . on the issue of whether the defendant's
explanation is pretextual.'" Reeves, 530 U.S. at 143.
Critically, "[t]he ultimate burden of persuading the trier of
fact that the defendant intentionally discriminated against
the plaintiff remains at all times with the plaintiff." Id.

To make out a *prima facie* case for failure to promote,
Samaan must show that (1) he is within a protected class; (2)
he was qualified for the job at issue; (3) he was subject to
an adverse employment action; and (4) the adverse action
raises an inference of discrimination. See Brown v. City of
Syracuse, 673 F.3d 141, 150 (2d Cir. 2012). A "claim of
discriminatory failure to promote falls within the core
activities encompassed by the term 'adverse actions.'"
Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002).

With respect to the fourth prong, whether the adverse action raises an inference of discrimination, that prong can be satisfied by offering evidence of the "employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group." Littlejohn v. City of New York, 795 F.3d 297, 312 (2d Cir. 2015). With respect to a failure-to-promote theory, Samaan can establish his *prima facie* burden of "[a]n inference of discrimination . . . if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications, or if the position was filled by someone not a member of plaintiff's protected class." Morris v. Ales Grp. USA, Inc., No. 04 Civ. 8239, 2007 WL 1893729, at *9 (S.D.N.Y. June 29, 2007). "[T]he evidence necessary to satisfy this initial [*prima facie*] burden [is] 'minimal' [or] 'de minimis.'" Zimmerman v. Assoc. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001).

Although claims under the NYCHRL use the same analytical framework, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108-09 (2d Cir. 2013). That is because "NYCHRL claims are to be

reviewed more liberally than Title VII claims, and the provisions of the NYCHRL must be construed broadly in favor of plaintiffs alleging discrimination." Johnson v. Andy Frain Servs., Inc., 638 F. App'x 68, 71 (2d Cir. 2016). To that end, once an employer has offered a legitimate, non-discriminatory motive for the employment action, summary judgment is appropriate only if "the record establishes as a matter of law that 'discrimination played no role' in its actions." Mihalik, 715 F.3d at 110 n.8. The Court will thus review and apply the NYCHRL's more liberal standard in assessing each of the claims in the first instance. As the Court finds that none of Samaan's claims meet even the broader standard, it is appropriate to dismiss those arising under the other various statutes without repeating the analysis.

The parties do not dispute that Samaan makes out the first prong of the requisite standard as he belongs to a protected class based on his age at the time of the applications (over 50 years old) and based on his Egyptian and Arab roots. The parties also do not focus on Samaan's general qualifications for the Civil Service title of Administrative Engineer. It is undisputed that Samaan possessed the basic minimum qualifications for the position while it was provisional, which were (1) a valid New York State License as a Professional Engineer; and (2) at least

six years of full-time experience as a civil engineer. (See, e.g., Defs.' Ex. 8 DEF251.) Whether summary judgment is appropriate thus centers around only the final two prongs: whether there was an adverse employment action and whether the action raises the inference of discrimination. Where those are satisfied, the Court must then assess the subsequent shifting of burdens.

1. The March 10, 2016 Application (ID: 235016)

The first actionable employment decision relates to Samaan's application for an Administrative Engineer, M-2, position on March 10, 2016. This event is actionable only under Sections 1981, 1983, and the NYSHRL and NYCHRL.

Samaan has established a *prima facie* case of discrimination for this event. Samaan experienced an adverse employment decision by not being promoted to the position. In this instance, Eisele was selected for the position. Eisele is white and Hispanic and was aged 35 at the time. Accordingly, although Eisele may be in a protected class by having a Hispanic origin, because Eisele was not in any of Samaan's protected classes (Egyptian, Arab, or by age), an inference of discrimination is raised. See de la Cruz v. New York City Hum. Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996) (explaining that an inference of discrimination was properly raise when the candidate hired,

a Black female, was "not a member of [the plaintiff's] protected class," i.e., Puerto Rican).

The burden of persuasion now shifts to Defendants. Defendants assert that after Samaan's interviews for this position with Hogan, D'Alessio, and Ross, the interviewers determined, as reflected in the interview logs, that Samaan did not "possess necessary preferred skills for the position." (Defs.' Ex. 8 DEF370.) In essence, Defendants' legitimate, non-discriminatory reason for not hiring Samaan is that, despite having the minimum basic qualifications, Samaan did not have the other qualifications necessary to fulfill the role, and on that basis, Eisele was more qualified.[10]

Here, there is substantial "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 257 (1981). Although the Civil Service title for the position was only Administrative Engineer, the position for

---

[10] Samaan asserts that he had much more experience than the candidates promoted over him -- like Eisele, Millner, and Allcot -- who he generally characterizes as "fresh out of college" and as "newly minted engineers." (Oppo. at 12.) While Samaan is correct that he had more seniority in terms of years at DOB than these candidates, the notion that candidates like Eisele and Millner are "fresh out of college" is disingenuous at best. The record reflects that both had around a decade of experience in engineering before being hired by DOB and had their Professional Engineering license for multiple years.

which Samaan applied had significant managerial responsibilities. The position had the office title "Executive Engineer" and was described as requiring the candidate to "monitor a team of engineers, architects, plan examiners and support staff dedicated to the agencies' professional oversight of Excavation." (Defs.' Ex. 8 DEF251). Samaan himself described the position as a promotion over a Director of Engineering position, which Samaan had previously applied for and was denied on the same grounds -- a lack of managerial experience. Further, Eisele had significant managerial experience from the private sector, including, for at least a year, "managing and overseeing a studio of approximately 10 engineers." (Eisele Dep. 23:8-14.)

Samaan's contention that he had the preferred experience on par with Eisele is belied by the evidence. Samaan's resume submitted with his application to the DOB indicates that he had only "indirect[] supervis[ion]" over technicians while at Tectonic Engineering. (Defs.' Ex. 7 DEF053.) And none of his other experiences prior to the DOB suggests that he had direct management, as opposed to mere supervisory, experience. Further, Samaan concedes that, while at the DOB, his supervisory experience was limited to training new engineers, interns, and inspectors. (See, e.g., Samaan Dep. 50:18-21.) Even when viewing these facts in the light most favorable to

Samaan, a jury could conclude that training new employees on department practices and expectations is not comparable to managing a team of engineers.

To that end, Samaan's proffered evidence of pretext falls short. "To prevent summary judgment on the strength of a discrepancy in qualifications . . . the discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask the unlawful discrimination." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001). Samaan must show that his "credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" Id. (citation omitted). Based on the undisputed evidence in the record of Eisele's qualifications, Samaan cannot overcome this burden.

As further evidence of pretext, Samaan asserts that the push by the DOB to hire outside engineers correlates to hiring "candidates who were white and younger" and as a result Samaan "did not stand any meaningful chance." (Counter Stmt. ¶ 44.) Samaan points to a line of questioning during D'Alessio's deposition during which D'Alessio conceded that he "did not

hire a black manager" during his tenure at the DOB. (D'Alessio
Dep. 137:11.) However, this comment is not necessarily cogent
evidence of D'Alessio's views as to persons in Samaan's
protected class, Egyptians and Arabs. The record shows that
D'Alessio had hired and promoted both Egyptians and Arabs in
the past, as well as persons older than Samaan.

The only evidence Samaan offers in support of the notion
that D'Alessio had animus towards Egyptians is the single,
uncorroborated comment D'Alessio made years earlier with
respect to Khaled Eid: "He's Egyptian?" This stray remark has
no connection to any of the actionable employment decisions
as to Samaan and is not probative of D'Alessio's animus or
intent. See Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d
111, 115 (2d Cir. 2007) (holding that "[t]he more a remark
evinces a discriminatory state of mind, and the closer the
remark's relation to the allegedly discriminatory behavior,
the more probative that remark will be"); Obinabo v.
Radioshack Corp., 522 F. App'x 55, 57 (2d Cir. 2013) ("When
considering 'stray remarks' as evidence of discrimination,
courts consider who made the remark, when the remark was made
in relation to the employment decision, the remark's content,
and the context in which the remark was made."); Abdu-Brisson
v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001)
("[Without] other indicia of discrimination [] properly

presented . . . the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination."). Although Samaan may show evidence of discrimination through criticism of himself or other employees "in ethnically degrading terms," D'Alessio's remark falls far short of an "invidious comment[] about others in [Samaan's] protected class." <u>Littlejohn</u>, 795 F.3d at 312. And Samaan makes no claim that any of the other Individual Defendants or decision makers made any remarks whatsoever about Egyptians, Arabs, or people of Samaan's age.

Further undermining Samaan's assertion that D'Alessio had animus towards people in Samaan's protected classes, although far from dispositive, is that D'Alessio hired Samaan in the first place. <u>See</u> <u>Watt v. N.Y. Botanical Gardens</u>, No. 98 Civ. 1095, 2000 WL 193626, at *7 (S.D.N.Y. Feb. 16, 2000) ("[The] underlying rationale for the [same-actor] inference is simple: it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class.").[11]

---

[11] The Court does not need to give much weight to the same-actor inference here as the other evidence undermining Samaan's claims is sufficiently heavy. But the Court recognizes that the "same-actor" inference has not uniformly been applied in failure-to-promote cases. The lack of broad application by courts rests on the notion that an employer may be willing to hire someone in the protected class, but "refuse to promote him into a position that includes a higher salary, job security and benefits." <u>Johnson v. Connecticut</u>, 798 F. Supp. 379, 390 (D. Conn. 2011). With that, the Court agrees. However, the Court finds that such factors are not necessarily present here and thus do not militate against invoking the

Accordingly, a reasonable jury could conclude that the "record establishes as a matter of law that 'discrimination played no role' in" Defendants' actions in failing to promote Samaan to the position of Executive Engineer. Mihalik, 715 F.3d at 110 n.8. The Court grants summary judgment in Defendants' favor as to these claims.

### 2.   The April 6, 2016 Application (ID: 237265)

The next actionable employment decision relates to Samaan's application for an Administrative Engineer position on April 6, 2016. This event is actionable only under Sections 1981, 1983, and the NYSHRL and NYCHRL.

Samaan applied for this position on April 6, 2016 and was never interviewed for the position. Samaan admits that the position was cancelled and then reposted but denies that the reason for the reposting was because DECAS had announced the examination for the Civil Service title of Administrative Engineer. (See Counter Stmt. ¶ 45.) However, Samman points to no comment or action by any defendant decision maker suggesting a discriminatory reason relating to Samaan's protected classes that motivated the cancellation of the exam.

---

inference. Id. (explaining that the inference is "permissive, not mandatory").

The evidence before the Court on this issue is rather benign. The record shows that Samaan emailed Trisha Munroe on May 11, 2016 asking whether the position is "still valid or [if] it was canceled." (Defs.' Ex. 8 DEF259.) Munroe told Samaan that the "position was cancelled [sic] and it was reposted as a Civil Engineer L-2." (Id.; see also Suppl. Ex. DEF262.) At the time, Samaan was already a Civil Engineer L-3, so the position would have been a demotion. Accordingly, a reasonable jury could find that Samaan faced no adverse employment decision in this instance and thus fails to establish a *prima facie* case of discrimination. Defendants are entitled to summary judgment on this claim.

### 3.   The June 6, 2016 Application (ID: 242484)

The next actionable employment decision relates to Samaan's application for an Administrative Engineer, M-2, position on June 6, 2016. This event is actionable only under Sections 1981, 1983, and the NYSHRL and NYCHRL.

The position had the business or office title of Director, Engineering. Samaan had previously applied for a similar Director level role on April 21, 2015, the position for which Eisele was initially hired. As relevant here, the posting noted that "4 years of managing a staff of 5 or more" was a preferred skill for the position. (Suppl. Ex. DEF263.)

On June 28, 2016, Samaan was one of five people interviewed for the position by Eisele and D'Alessio, and Samaan was selected as the "Back up selection, 2nd Choice." (Defs.' Ex. 8 DEF371.) Millner, who is white and was 32 at the time, was recommended and eventually hired into the position. Accordingly, Samaan has established a *prima facie* case of discrimination.

Defendants generally assert that the legitimate, non-discriminatory reason for hiring Millner over Samaan is that "the hiring committee deemed [him] to be more qualified." (Brief at 10.) The Court's review of the record shows that before being hired as Director of Engineering for the Excavation Unit, Millner testified he was an "administrative engineer with the forensic engineering unit" beginning in "July 2015." (Millner Dep. 9:12-17.) Before that, Millner worked for a private engineering firm, Robert Silman Associates ("Silman"), starting in 2006. (Id. 10:25; 11:22.) At Silman, Millner was eventually promoted to "senior engineer" (id. 16:10), a position he held for "roughly two years until [he] received the next promotion" (id. 16:13-15). After eight years with Silman, Millner became a "senior project engineer." (Id. 23:3-6.) In that role he was "managing the most complex project[s] that the office would have. And, managing younger staff." (Id. 23:11-16.) Millner managed "a

45

team of five or six" ranging "from senior engineer to project engineer to engineer, to interns." (Id. 23:22-24:8.) Although Samaan says that Millner had "much less experience," the undisputed evidence regarding Millner's qualifications rebuts that assertion and thus removes the presumption of discrimination from the equation.

In his response to Defendants' Rule 56.1 Statement, Samaan focuses on his own testimony that D'Alessio "wanted to get Mathew Millner as a Director of Engineering" and that he was trying to "convince [Samaan] to leave this position or not to have the interview." (Samaan Dep. 83:9-14.) This self-serving testimony is uncorroborated and does not create a genuine issue of material fact sufficient to carry Samaan's burden at this stage. See Deebs v. Alstom Tranp., Inc., 364 F. App'x 654, 656 (2d Cir. 2009) (affirming district court grant of summary judgment in discrimination case where "the only 'evidence' cited in the plaintiffs' brief is their own self-serving testimony" and where plaintiffs "made no attempt . . . to square their own speculative, and subjective, testimony with the hard evidence adduced during discovery"); Mason Tenders Dist. Council Welfare Fund v. Dismantling Corp., 400 F. Supp. 3d 7, 15 (S.D.N.Y. 2019) ("Self-serving, conclusory affidavits, standing alone, are

insufficient to create a triable issue of fact and defeat a motion for summary judgment.").

Samaan also suggests that he was more qualified than Millner by pointing to the fact that he scored higher on the exam administered by DECAS for the Administrative Engineer Civil Service title. This is a red herring. Although true that Samaan scored 100 percent while Millner scored 88 percent (see Pl.'s Ex. 15), these scores were not before the interviewers at the time Samaan applied and interviewed for this position. The test results were not yet released. Nor are those scores necessarily probative of the more-subjective preferred skills required for the Director-level position.

Samaan has not shown that his qualifications were "so superior to the credentials of the person selected for the job," and it remains that a "reasonable person, in the exercise of impartial judgment, could have chosen [Millner] over [Samaan] for the job in question.'" Byrnie, 243 F.3d at 103 (citation omitted). Under NYCHRL's more liberal standard, a reasonable jury could conclude that the "record establishes as a matter of law that 'discrimination played no role' in" Defendants' actions in failing to promote Samaan to this position. Mihalik, 715 F.3d at 110 n.8. Accordingly, summary judgment in Defendants' favor is granted as to these claims.

### 4.   The August 10, 2016 Application (ID: 249788)

The next actionable event relates to Samaan's application for an Administrative Engineer position on August 10, 2016. This event is actionable only under Sections 1981, 1983, and the NYSHRL and NYCHRL.

The Court finds that Samaan has failed to establish a *prima facie* case of discrimination because Samaan did not face an adverse employment decision. Unfortunately, neither party's brief directly addresses whether Samaan has established a *prima facie* case for this event, let alone the third prong. The Court considers the arguments and evidence based on the Rule 56.1 Statement and Counter Statement as well as its own review of the record.

In their Rule 56.1 Statement, Defendants state that "Samaan was not interviewed for this position." (Rule 56.1 Stmt. ¶ 47.) Defendants' assertion is supported by documentary evidence. The interview logs, dated August 31, 2016, indicate that Samaan was due to be interviewed by Eisele and Millner and that three other candidates were also interviewing for the position, Austin Allcot, Imran Akond, and Md Shariful Islam. (Defs.' Ex. 8 DEF374.) The logs also include a code ("DI") indicating that Samaan declined the interview. (Id.)

In his Counter Statement, Samaan does not specifically dispute that he declined the interview for this position. However, at his deposition, Samaan testified generally that he "never declined" an interview. (Samaan Dep. 49:19.) This is rebutted by Defendants' documentary evidence. About a week after Samaan applied for this position, on August 18, 2016, Eisele emailed Samaan with the subject line "Admin Engineer Posting 249788." (Defs.' Ex. 8 DEF460.) Eisele told Samaan that he would like to "discuss this position early next week," to which Samaan agreed. Although somewhat later in time, on October 31, 2016, Eisele emailed himself "for [the] record" that "Samaan declined to interview after discussion. It appears the maximum posted salary for this job posting was too low for the applicant and he declined to interview." (Id.) Eisele's later-in-time comments are buttressed by the contemporaneous interview log (id. DEF374), the posted salary range for the position with a maximum salary of $105,000 (Suppl. Ex. DEF265), and Samaan's salary at that time he applied, $108,396 (Defs.' Ex. 8 DEF340). The Court does not credit Samaan's general objections, made in response to other facts, to the posted salary ranges. Nor does it countenance his comment that "there was no way he would have received less than his current salary irrespective of the posted

salary."[12] (Counter Stmt. ¶ 40.) Without more, Samaan does not create a genuine dispute of material fact as to whether he suffered an adverse employment decision. Accordingly, the Court grants summary judgment on these claims.

### 5.   The December 2016 "BEST Squad" Application

The next actionable event relates to Samaan's application for an Administrative Engineer (Non-Managerial/Architect) position within the BEST Squad in December 2016. This event is actionable only under Sections 1981, 1983, and the NYSHRL and NYCHRL.

As described above, Samaan interviewed with Chiusano and Jostok on December 19, 2016. Both Chiusano and Jostok gave Samaan high objective scores in his evaluation. The interview logs, signed by Chiusano and Jostok, show that they ranked Samaan as qualified and that he was the third choice for the position. (See Defs.' Ex. 8 DEF375.) Robert Masone was the first choice. (See Defs.' Ex. 8 DEF375.) Although neither party identifies Masone's age, race, or national origin, the Court resolves the ambiguity in Samaan's favor and assumes that he does not belong to any of Samaan's protected classes.

---

[12] Samaan lodges the, somewhat conspiratorial, assertion that certain "salary cap[s] [were] specifically designed to stop [Samaan] from applying." (Counter Stmt. ¶ 40.) While Samaan has no evidence of this being true, the absurdity of the proposition is exposed further by reference to state law, which uniformly sets salary grades for Civil Service positions. See N.Y. Civ. Serv. L. § 130.

Accordingly, Samaan has established a *prima facie* case of discrimination.

Defendants' legitimate, non-discriminatory reason offered is that Masone was ranked as more qualified for the position based on Chiusano and Jostok's assessment following the interview based on the interview logs in evidence. Defendants need not rely on more since neither Chiusano nor Jostok are accused by Samaan of holding discriminatory views towards Samaan's protected classes. Defendants' contentions are sufficient to eliminate the presumption of discriminatory intent under the McDonnell Douglas burden shifting analysis.

Samaan generally disputes Defendants' recitation of the facts here. (See Counter Stmt. ¶ 49.) But rather than assert that Samaan was more qualified than Masone -- and the record is devoid of evidence of Masone's qualifications -- Samaan asserts that he was actually offered the position by Chiusano but that D'Alessio subsequently intervened. (See Oppo. at 12.)

Samaan's assertions on this point in his brief are somewhat inconsistent with his assertions in his Counter Statement and to which he testified during his deposition. In his Opposition, Samaan states that it was the "intervention" of D'Alessio that caused Samaan to not get the position. In his Counter Statement, Samaan asserts that he was "approached

by Leonid Miller and Geoffrey Eisele who spoke to him and
told him they would create a Deputy Manager's position for
him to stay in the [Excavation Unit's] Department" and that
Miller had "heard that [Samaan] declined" the position with
the BEST Squad. (Counter Stmt. ¶ 49.) This is in accord with
Samaan's deposition testimony, where Samaan said he had a
meeting around Christmas time in 2016 with Miller where they
discussed the title of Administrative Engineer at length, and
during which Samaan said Miller "considered that [Samaan]
declined the position."[13] (Samaan Dep. 87:9-88:19.) What is
ambiguous is whether Miller heard from D'Alessio that Samaan
had "declined" the position. The Court assumes that was the
case.

But other than Samaan's own testimony that D'Alessio
intervened, Samaan provides nothing else to support that
fact. Nor does he support the assertion that he was initially
offered the job by Chiusano and that it was then taken away

---

[13] Miller did not recall ever hearing about Samaan applying for or being
selected for a position in the BEST Squad. (Miller Dep. 23:24-24:13.)
Notably, while Samaan's Counter Statement says that Miller and Eisele
"told him they would create a Deputy Manager's position for him to stay
in the Department," (Counter Stmt. ¶ 49), Samaan's deposition testimony
does not indicate that Miller offered him a Deputy Manager position *in
the Excavation Department* during the Christmas 2016 meeting. In fact, the
notion that Samaan was offered a Deputy Manager position in the Excavation
Department is entirely unsupported by the summary judgment record, as the
only Deputy level position Samaan was being considered for was that within
the Cranes and Derricks unit, and Samaan's testimony indicates that the
conversation did not occur during the Christmas time meeting but rather
in January 2017.

from him. The record unambiguously indicates the opposite.
The interview logs, signed by both Chiusano and Jostok,
confirm that that they believed that, although qualified,
Samaan was only the third choice for the position. And Samaan
offers no evidence of Miller holding discriminatory animus
towards persons in Samaan's protected class. Samaan's
speculation on this point is insufficient to create a genuine
issue of material fact for a jury to resolve. Samaan thus
fails to carry his burden as the "record establishes as a
matter of law that 'discrimination played no role' in"
Defendants' actions in failing to promote Samaan to this
position. Mihalik, 715 F.3d at 110 n.8. Accordingly, summary
judgment in Defendants' favor is granted as to these claims.

      6.   The "Cranes and Derricks" Application (ID: 283669)

The next actionable event relates to Samaan's
application to be the Deputy Director of the Cranes and
Derricks Unit, which had the Civil Service title of
Administrative Engineer, M-1. As discussed above, the Court
is persuaded that this event took place in January 2017
despite the parties' reference to it occurring at some time
in 2018. This event is thus actionable under all applicable
statutes.

According to Samaan, he was encouraged by Miller to "apply for the position of Deputy Director of the Cranes and Derricks Unit." (Defs.' 56.1 Stmt. ¶ 58.) Samaan admits that he met with two persons, Ashraf Omran, who is part of Samaan's protected class as an Egyptian man, and Dan Esknasy. As to Esknasy, Samaan testified that he was "older than me." (Samaan Dep. 93:14-15.) In response to the Rule 56.1 statement, Samaan contradicts his deposition testimony indicating that Esknasy was "younger than him." (Counter Stmt. ¶ 60.) Esknasy may be younger than Samaan, but Defendants also state that Esknasy was at least "in his late 40s at the time" -- a point Samaan does not rebut. Viewing this evidence in the light most favorable to Samaan, even if Esknasy was not older than Samaan, he is at least part of one of Samaan's protected classes by age by being at least above forty years old and potentially only a few years younger than Samaan.

Samaan, however, contends that his interviews with Esknasy and Omran were, essentially, farces. He states that "no actual interview took place as Esknasy stated he had no relevant knowledge and was in a hurry to leave and left shortly after and Omran was just having friendly conversations not related to the job." (Counter Stmt. ¶ 58.) Samaan offers only his own testimony in support of this assertion. And Samaan does not explain how the purported informality of the

interview raises an inference of discrimination, as no
evidence in the record indicates that Samaan was treated
differently than other interviewees.

Further, as Omran and Esknasy both fall within certain
of Samaan's protected groups, that fact critically undermines
discriminatory intent as there is no indication that any of
the other Individual Defendants oversaw or intervened in the
hiring decision. See Inguanzo v. Hous. & Servs., Inc., No. 12
Civ. 8212, 2014 WL 4678254, at *18 (S.D.N.Y. Sept. 19, 2014)
("[C]ourts recognize that an allegation that a decision was
motivated by discriminatory animus is weakened when a
decisionmaker is a member of the same protected class as the
plaintiff."); Connell v. Consol. Edison Co. of N.Y., Inc.,
109 F. Supp. 2d 202, 209 (S.D.N.Y. 2000) (finding evidence of
discrimination "extremely thin" where "[a]ll the
decisionmakers were also in the protected [] category").

Samaan also indicates that the position remained open
and that eventually a younger white woman was hired for the
position, raising the required inference of discrimination.
However, there is no evidence in the record indicating that
Samaan "applied for [the position] many times" nor is there
any evidence in the record that a "young white woman was hired
into that position." (See Oppo. at 5.) The only shred of
evidence as to what happened after Samaan met with Omran and

Esknasy was Miller's testimony that "the position was cancelled by human resources," indicating that no one was hired for the position at the time Samaan applied. (Miller Dep. 35:9-11.) Although the Court is cognizant that Samaan's *prima facie* burden is de minimis, it is not nothing. Samaan has failed to present any compelling evidence from which a reasonable jury could find that Defendants' failure to promote Samaan to the position within Cranes and Derricks was motivated by discriminatory animus. Samaan thus fails to establish a *prima facie* case of discrimination and summary judgment is appropriate on this claim.

### 7.   The June 28, 2017 Application (ID: 291755)

The final employment event for which Samaan has made a timely claim relates to his June 28, 2017 application for an Administrative Engineer (Non-Managerial) position. Like the Cranes and Derricks position, this claim is actionable under all relevant statutes.

Samaan interviewed for this position around the time that he had already accepted the grant-funded position (which came with the title, Administrative Engineer). The position itself was posted due to the vacancy created by Samaan's departure, although now listed with the Civil Service title Administrative Engineer. Samaan was interviewed by Eisele, Millner, Ross, and Miller and was one of four applicants

interviewed for the position in July, after Samaan had started the grant-funded position. Samaan was not recommended for the position, despite previously holding the position. Austin Allcot was selected for the position. Allcot is white and was thirty-four at the time, twenty-two years younger than Samaan, thus raising an inference of discrimination.

Even so, the Court is somewhat skeptical that Samaan actually suffered an adverse employment action in this instance. First, the position that Samaan was applying for was not a promotion. It is undisputed that the position was posted to fill the vacancy created by Samaan's departure. Further, Samaan's grant-funded position, although not within the DOB, had the Civil Service title of Administrative Engineer that Samaan was seeking through his application to this position. Thus, it is unclear how, other than getting rejected, the employment decision is truly adverse, including because the posted salary maximum was lower than what Samaan was making at the time. Nevertheless, the Court resolves these issues in Samaan's favor and finds that Samaan has established a *prima facie* case of discrimination.

Defendants offer that Allcot was more qualified as the legitimate, non-discriminatory reason for not recommending Samaan for the position. In this instance, however, Defendants' use of "qualified" refers not to a measure of

experience or Samaan's position on the recently released
Civil Service list, but rather to Samaan's interview
performance. See Byrnie, 243 F.3d at 104 ("[T]here is nothing
unlawful about an employer's basing its hiring decision on
subjective criteria, such as the impression an individual
makes during an interview."). Defendants assert that the
interviewers did not select Samaan in part because of his
interview performance, in which they described him as hostile
and failing to make eye contact with interviewers. (See Eisele
Dep. 42) Specifically, Eisele recalled in his deposition that
Samaan's "interview performance was not very good. He was
border line hostile. He did not make eye contact with any
interviewers." (Eisele Dep. 42:3-6). Defendants also assert
that, during the interview, Samaan was not truthful about his
experience working for the DOB, including regarding issuing
violation reports and performing certain tasks. See Meiri v.
Dacon, 759 F.2d 989, 996-97 (2d Cir.1985) (An "employer's
explanation of its reasons must be clear and specific" to
"afford the employee a full and fair opportunity to
demonstrate pretext").

Samaan denies that he was hostile and asserts that the
interview was "prejudged" and that Eisele was "hostile
because he assumed that [Samaan] would be hostile and went
and got HR and others before the interview started." (Counter

Stmt. ¶ 51.) Samaan also denies that he was untruthful about
being insubordinate, about failing to issue enforcement
orders, and failing to adhere to certain protocols,
suggesting that these points were conjured up after the fact
and pretextual. (See id. ¶¶ 52-58.)

As to the number of people present during the interview,
Samaan does not argue that he was treated unfairly in the
interview, but, more importantly, neglects to reference that
he had very recently filed a complaint with the DOB's Equal
Employment Office. Thus, even viewing these facts in a
favorable light for Samaan, a reasonable jury could conclude
that the decision to bring Human Resources to the interview
was a logical extension of those precipitating events rather
than as evidence of discriminatory animus. Samaan also does
not indicate that he was treated differently and that others
were interviewed by fewer people.

Further, Samaan's evidence offered in rebuttal of what
duties he may have failed to perform is not persuasive. Samaan
offers performance reviews up through June 2016 of his
performance. (See Pl.'s Exs. 8, 9, 11.) However, the evidence
of inadequate performance cited by Defendants relates to the
late-2016, early-2017 period. That evidence indicates that
Samaan failed to produce certain reports required under
protocol (see Defs.' Ex. 8 DEF408); failed to issue violations

(see id. DEF410-11); and was insubordinate by refusing to
report to certain sites (see id. DEF436-37). Each of these
incidents took place after Samaan's positive reviews. And
evidence of past positive results is not probative of future
performance. See Davies v. N.Y.C. Dept. of Educ., 563 F. App'x
818, 820-21 (2d Cir. 2014) (holding that plaintiff could not
"use her past performance to shield her
from . . . unsatisfactory performance evaluations"); Orisek
v. Am. Inst. of Aeronautics & Astronautics, 938 F. Supp. 185,
191 (S.D.N.Y. 1996) ("[Plaintiff's] disagreement with her
employer's perceptions of her job performance does not
satisfy her burden of showing that the Institute's proffered
justification was a pretext for discrimination.").

Moreover, Samaan provides no documentary evidence to
rebut Millner's interview notes indicating that Samaan was
not accurate with his answers. Those notes were taken
contemporaneously with the interview for the position. (See
Suppl. Ex. DEF394.) Millner wrote that "most of [Samaan's]
responses did not apply to the question asked," that
"applicant noted he wrote incident reports which was not
always true," and that "applicant noted he issued summons &
DOB violations which did not regularly occur." (Id.) Rather,
Samaan merely advances that it was "not his job to issue
enforcement orders." (Counter Stmt. ¶ 53; Pl.'s Ex. 6.) This

statement can neither be reconciled with Millner's contemporaneous notes that Samaan said he issued summons and enforcement orders, nor can it be harmonized with Samaan's own evidence that department protocol required engineers, like Samaan, to "consider and recommend appropriate enforcement action against responsible parties." (Pl.'s Ex. 7 at 3.)

To the extent that these documents and evidence were prepared after Samaan left the unit, Samaan's appeal to pretext is equally unpersuasive. Samaan testified that he had filed a complaint with the DOB's EEO "[r]ight before [he] le[ft] the department." (Samaan Dep. 95:16-17.) It is unsurprising that, in response to a complaint of discrimination, the Department would gather documents and investigate Samaan's claims. Such a response is a natural consequence of such a complaint being filed. Even viewing the facts in the light most favorable to Samaan, the Court is persuaded that there is nothing in the record that could lead a reasonable jury to conclude that the Defendants' decision to not promote (if it can even be considered a promotion) Samaan to this position (one he had just left) was motivated by discriminatory animus. Accordingly, the Court grants summary judgment for Defendants on this claim.

8.   <u>Samaan's Remaining Arguments</u>

Samaan makes a few more general arguments in support of discriminatory motive. None of the arguments or evidence offered by Samaan create a genuine dispute of material fact as to the actionable employment events sufficient to overcome summary judgment.

For example, with respect to D'Alessio's treatment of Egyptians, Samaan points to the removal of Khaled Eid from his position within the Excavation Unit as evidence of animus. The record indicates, however, several people in DOB management testified to having experienced issues with Eid's engineering competency and skills. (See, e.g., D'Alessio Dep. 74:14-20, 101:22-102:2, 102:11-103:2; Defs.' Ex. 5, Dkt. No. 91, "Corral Dep.," 65:6-66:14, 76:6-9, 77:7-9; Miller Dep. 33:16-34:15.) Further undermining this point is that D'Alessio approved the hiring of others in Samaan's protected class during his tenure including, Ghouse Ismail (whom D'Alessio believed was Arab and who is older than Samaan) and Naweed Chaudri (Arab).

Samaan also points to the treatment of Waheed Dughman (Ethiopian and aged fifty-five) and Floyd Joseph (Guyanese and aged around fifty-five at the time), two employees who were transferred out of the Excavation Unit to the BEST Squad. Neither event is probative of D'Alessio's or any other

Individual Defendant's intent. On one hand, the record indicates that Joseph had been disciplined by Ismail for sleeping at the office and on the job. And on the other hand, D'Alessio oversaw the BEST Squad, undermining the inference that Samaan seeks to have drawn by the Court. (See D'Alessio Dep. 54:2-25 ("I became the manager of other units that I accrued over the years. . . . [F]inally I got a unit that came to be . . . the BEST squad.").

Samaan also argues that the Court should not grant summary judgment because in a previous lawsuit against the DOB alleging discrimination under the same causes of action and during the same time period, another court in this district denied summary judgment in part. (See Oppo. at 10, 16 (citing McCalla, 2017 WL 3601182).) While true that D'Alessio was named as a defendant in McCalla and that Miller was referenced in passing, the Court's review of the lengthy Report and Recommendation of the Magistrate Judge, later adopted by the court, indicates that the court made no findings that D'Alessio or Miller had discriminatory animus towards the plaintiffs there. And certainly, none that would (or could) impact this Court's review of the evidence here. See McCalla, 2017 WL 3601182, at *39 (recommending dismissing claim of discrimination asserted against D'Alessio), *63 (recommending granting summary judgment for defendants for

63

failure-to-promote claim asserted against D'Alessio), *65, *73 (denying summary judgment in claim against D'Alessio only because "defendants rely entirely on their statute of limitations argument" and making no findings as to D'Alessio's intent). The Court is neither bound by the limited findings made in McCalla, nor does it find them persuasive as to the facts and issues alleged here, including because McCalla primarily involves different protected classes.

Samaan's appeal to his scores on the Civil Service exam is also not persuasive. For example, Samaan relies on his 100 percent score on the competitive exam to say he was more qualified than the other candidates selected over him. However, those scores were not finalized until June 8, 2017 and had no effect on all but one of Samaan's applications: the June 28, 2017 application for which Austin Allcot was hired. But as discussed above, Defendants offered legitimate, non-discriminatory reasons for not hiring Samaan -- namely, his poor interview performance -- and Samaan has failed to show those reasons were pretextual. As to all the other promotions for which Samaan was denied, any failure to follow the Civil Service Rules for selecting candidates from the eligible list has no impact on the Court's findings as to discriminatory motive.

Further, the Court disagrees with Samaan to the extent that he argues that a discriminatory motive can be inferred from procedural irregularities in following the Civil Service Rules. Nothing in the record establishes that Samaan was treated differently than any other candidate with respect to the Civil Service Rules. Without evidence of disparate treatment, no discriminatory motive can be inferred. See, e.g., Nurse v. Lutheran Med. Ctr., 854 F. Supp. 2d 300, 320 (E.D.N.Y. 2012) ("[E]ven if the court were to find that [defendant] departed from its Policies, plaintiff's failure to present any evidence that any such departure was due to unlawful discrimination is fatal to her claim."); see also McCalla, 2017 WL 3601182, at 25 (explaining the "inference of discriminatory motive drawn from DOB's failure to follow the civil service rules" was weakened where "the record contain[ed] no evidence showing that defendants ignored the civil service rules in a manner indicative of discriminatory animus -- i.e., that the rules were followed or ignored specifically to disadvantage members of a protected class"). Ultimately, none of Samaan's arguments save him from summary judgment on his failure-to-promote claims, and the Court grants Defendants' motion.

D.   <u>RETALIATION</u>

Much like a failure-to-promote claim, to make out a case of retaliation, Samaan must establish a four-part framework. The four-part framework is that (1) Samaan participated in a protected activity; (2) Defendants had knowledge of the protected activity; (3) Samaan suffered an adverse employment action as a result of that activity; and (4) there is a causal connection between the protected activity and the adverse employment action. <u>See</u> <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005). As above, if Samaan establishes a *prima facie* case, then the burden shifts to Defendants to offer legitimate, non-discriminatory reasons for the employment decisions. Samaan must then show that their reasons are pretext.

Samaan does not clearly identify when exactly he engaged in the protected speech for which he claims retaliation. The tableau depicted by the record is that Samaan complained interminably. Samaan admits that he began complaining about his title in 2011 and continued to do so through 2017. (<u>See</u> Counter Stmt. ¶ 22.) That notion is confirmed in his Opposition where Samaan notes that "D'Alessio also admitted that [Samaan] never stopped complaining throughout his time in the Unit." (Oppo. at 14.) Such vague generalities make it near impossible for the Court to parse the required

66

considerations and even harder for the Court to causally connect any protected speech by Samaan to any discrete employment event.

That said, in this case the Court does not need to assess whether Samaan has actually established a *prima facie* case of retaliation. Even if the Court assumes that Samaan has made such a showing, the record clearly establishes, as discussed at length above, that for each actionable adverse employment action complained of Defendants' proffered non-discriminatory reasons are not pretextual. Thus, Samaan cannot establish retaliation as a matter of law and the Court grants summary judgment for Defendants.

## IV.   <u>ORDER</u>

For the foregoing reasons, it is hereby

**ORDERED** that defendant Jeff Corral ("Corral") is dismissed from the case with prejudice pursuant to Federal Rule of Civil Procedure 4(m); and it is further

**ORDERED** that the motion for summary judgment (Dkt. No. 74) of defendants the City of New York, Robert D'Alessio, Geoffrey Eisele, Leonid Miller, and Matthew Millner is granted.

The Clerk of the Court is directed to terminate all pending motions and to close this case.

**SO ORDERED.**

Dated:      14 March 2023
            New York, New York

_____
            Victor Marrero
            U.S.D.J.